IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DONALD EDWIN THAMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:16CV103 |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Donald Thames ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for Disability Insurance Benefits on November 9, 2012, alleging a disability onset date of October 2, 2012. (Tr. at 13. 161-63.)[2] His claim was denied initially (Tr. at 67-82, 103-11), and that determination was upheld on

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #10].

reconsideration (Tr. at 83-99, 113-20). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 121-22.) Plaintiff attended the subsequent hearing on June 3, 2015, along with his attorney and an impartial vocational expert. (Tr. at 13.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 25-26), and, on January 4, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-5.)

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his amended alleged onset date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments: "obstructive sleep apnea; gastro-esophageal reflux disorder (GERD); hypertension; hyperlipidemia; obesity; fibromyalgia; history of umbilical hernia; major depressive disorder; and generalized anxiety disorder." (Tr. at 15.) The ALJ found at step three that none of these impairments met or equaled a disability listing.

---

determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

(Id.)  Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform medium work with additional limitations to:

> occasional climbing of ropers, ladders, and scaffolds; frequent crouching, stooping, kneeling, and crawling; simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few work place changes; no work at a fixed production rate or pace; occasional contact with supervisors and coworkers; can work in proximity to others, but not in coordination with others; and should have no public contact.

(Tr. at 18.)  Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not return to his past relevant work.  (Tr. at 24.)  However, based on the vocational expert's testimony, the ALJ determined at step five, that, given Plaintiff's age, education, work experience, and RFC, he could perform other jobs available in the national economy.  (Tr. at 25.)  Therefore, the ALJ concluded that Plaintiff was not disabled under the Act.  (Tr. at 25-26.)

Plaintiff now challenges the ALJ's decision in two respects.  First, at step three of the sequential analysis, Plaintiff contends that the ALJ failed to appropriately consider whether his depression met 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04 (hereinafter "Listing 12.04").  Second, Plaintiff argues that the ALJ failed to properly weigh the opinion of Dr. Marshall, Plaintiff's treating psychiatrist at Piedmont Psychiatric Associates, PA.  (Pl.'s Br. [Doc. #14] at 3.)  Because Dr. Marshall's opinion forms the primary basis for Plaintiff's step three argument, the Court addresses Plaintiff's claims in reverse order.

    A.    Dr. Marshall's Opinion

Plaintiff contends that the ALJ erred by failing to give controlling weight to the medical opinions of Dr. Marshall in accordance with 20 C.F.R. § 404.1527(c)(2), better known as the "treating physician rule."  The treating physician rule generally requires an ALJ to give

controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2; 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.[5] Moreover, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

---

[5] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

7

In the present case, Dr. Marshall issued multiple opinions regarding Plaintiff's functional abilities, including a Psychiatric Review Technique ("PRT") and letter, both issued in December of 2012, and a second PRT and form medical statement, both issued in January of 2014. (Tr. at 332-44, 346, 364-70, 417-28.) In the first PRT, completed in December 2012, Dr. Marshall indicated that Plaintiff experienced the following symptoms of depression from 2000 through the assessment date of December 6, 2012: "anhedonia or pervasive loss of interest in almost all activities," "sleep disturbance," "psychomotor . . . retardation," "feelings of guilt or worthlessness," and "difficulty concentrating or thinking." (Tr. at 332, 335.) Dr. Marshall further opined that, throughout the 12-year period covered by the assessment, Plaintiff's depression caused "extreme" limitations in his activities of daily living and his ability to maintain concentration, persistence, or pace, "marked" difficulties in his ability to maintain social functioning, and had resulted in four or more "episodes of decompensation, each of extended duration." (Tr. at 342.) In fact, Dr. Marshall indicated in the PRT that Plaintiff's depression was so severe that it "resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate," and that Plaintiff's mental health history included "1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (Tr. at 343.)

Along with his PRT, Dr. Marshall submitted a letter to Plaintiff's attorney, dated December 20, 2012, which read as follows:

> Mr. Donald Thames has been a patient of mine since well before 2000. He has suffered with chronic depression or Dysthymic Disorder since that time and has bouts of Major depression on top of the Dysthymia. This is frequently referred to as "double depression." His depression has been resistant to a

8

variety [of] treatment methods. His symptoms include anhedonia, crying episodes, poor focus and concentration, difficulty staying on tasks and completeing [sic] tasks, sleep disturbance[,] fatigue[,] and profound dysphoria. He has tried to maintain employment, but has found this an uphill battle and recently found it simply impossible to continue on with regular work. He has similar difficulties in the home and has a very limited support structure. He is currently on several psychotropic medications including a combination of three antidepressants, Celexa, Trazodone, and Wellbutrin. It is my professional opinion that he is full [sic] disabled and unable to maintain gainful employment. In that his symptoms are longstanding, I further believe he is permanently [sic] disabled and would be unable to secure and carry out employment for the rest of his life.

(Tr. at 331.)

Just over a year later, on January 2, 2014, Dr. Marshall completed a second PRT, this time characterizing the assessment as spanning from approximately 1993 through the present. (Tr. at 417.) At that time, in addition to the depressive symptoms identified in the 2012 assessment, Dr. Marshall also indicated that Plaintiff had "decreased energy" and "thoughts of suicide." (Tr. at 420.) However, in rating the severity of Plaintiff's functional limitations, Dr. Marshall found only moderate restrictions in terms of activities of daily living and social functioning, as opposed to the "extreme" and "marked" limitations posited in 2012. (Tr. at 427.) The degree of limitation in Plaintiff's concentration, persistence, and pace remained extreme, and Dr. Marshall again asserted that Plaintiff's depression had caused "repeated episodes of decompensation, each of extended duration" and that "even a minimal increase in mental demands or change of environment would be predicted to cause [him] to decompensate." (Tr. at 427-28.) Dr. Marshall included no notes explaining the basis for his opinions. (Tr. at 430.)

One week later, on January 9, 2014, Dr. Marshall filled out and signed an attorney-provided checklist form mirroring the PRT. However, when asked to rate Plaintiff's degree

9

of limitation due to depression, Dr. Marshall indicated "extreme" restrictions in activities of daily living and "marked" difficulties in social functioning, which was inconsistent with his opinion from only one week earlier. (Tr. at 365.) For example, on January 2, Dr. Marshall opined that Plaintiff had only "moderate" restrictions in daily living, but on January 9, Dr. Marshall opined that Plaintiff had "extreme" restrictions in activities of daily living. Similarly, on January 2, Dr. Marshall opined that Plaintiff had "moderate" limitations in social functioning, but on January 9, Dr. Marshall opined that Plaintiff had "marked" limitations in social functioning. There is no medical evidence indicating any change in Plaintiff's condition during that week, or any record of any treatment during that time period. In the comments section of the questionnaire on January 9, Dr. Marshall noted that Plaintiff was "completely unable to maintain focus needed to work even on a part-time basis," but did not provide any further explanation. (Id.)

In her decision, the ALJ cited each of the above opinions but ultimately assigned them little weight. (Tr. at 23.) In doing so, she recounted the internal inconsistencies described above and concluded that Dr. Marshall's opinions should be given little weight in light of the "internal inconsistencies between his opinions." (Tr. at 23.) The ALJ further explained that:

> [T]he extent of limitations noted in [Dr. Marshall's] opinions, particularly in [his December 20, 2012 letter], as well as his opinion that the claimant is "completely unable to maintain focus needed to work even on a part-time basis[,]" is not consistent with the treatment notes that document minimal reports of symptoms, fairly normal mental status upon examination but for dysthymic mood, and indicate he has been maintained on predominately the same dosage of medication for some time (which suggests good control of his symptoms). Further, the limitations as noted by Dr. Marshall are also not consistent with the claimant's reported activities of daily living, including going out to restaurants and to the gym, as well as the claimant's own testimony regarding his limitations.

10

>Moreover, Dr. Marshall's opinions that the claimant is . . . "fully disabled and unable to maintain gainful employment" and "permanently disabled" are opinions on issued reserved for the Commissioner, and therefore, not entitled to great weight.

(Tr. at 23.)

The ALJ then contrasted and adopted the opinions of State Agency Psychological Consultants Jeff Long and Nancy Lloyd, issued in July and August, respectively, of 2013. Drs. Long and Lloyd opined that Plaintiff had moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace, and had suffered no episodes of decompensation. (Tr. at 24, 76-78, 90.) "Further, despite these limitations, they opined [that Plaintiff] could perform the demands of simple tasks with minimum interaction with others." (Tr. at 24.) The ALJ went on to explain that:

> These opinions are consistent with Dr. Marshall's treatment notes that document that other than dysthymic mood, the claimant consistently had rather normal mental status. Additionally, the claimant was also maintained on predominately the same dosages of medication, which suggests good control. He also reported a fairly wide range of activities of daily living, and although he reported particular problems interacting with others, he is capable of going out in public to restaurants, the gym, and for shopping purposes. It is also noteworthy that he can spend hours on the computer and watch movies and television, which suggests an ability to focus and maintain attention. While he had one inpatient hospitalization, it was prompted predominately by legal problems, and the record documents improvement in his anxiety by the following month. Accordingly, for these reasons, Dr. Lloyd's and Dr. Long's opinions have been given great weight in making this finding.

(Tr. at 24.)

As indicated by the ALJ, Dr. Marshall's treatment records fail to reflect the severe depressive symptoms and functional limitations set out in his opinions. Approximately a year before Plaintiff's onset date, on October 20, 2011, Dr. Marshall noted that Plaintiff had been seen at Piedmont Psychiatric Associates since before 2000 for a combination of psychotherapy

11

and medication management for dysthymic disorder, and that he had no history of inpatient psychiatric interventions. At that time, Plaintiff's symptoms were noted to have "escalated" to include "mild" depression, and his dose of Wellbutrin was increased. (Tr. at 315.) Treatment notes through August 2012 consistently noted improvement in Plaintiff's depression on that dosage. (Tr. at 312-14.) However, on October 4, 2012, two days after his alleged onset date, Plaintiff returned to Dr. Marshall and reported "walk[ing] off of his job after 14 years as he hated it and was increasingly having trouble with memory and concentration. Especially worse after recently being moved to customer service." (Tr. at 311.) At that appointment, Dr. Marshall "[d]iscussed not using Ambien which could be affecting [Plaintiff's] memory" and switched his sleep medication to trazodone. (Id.) On November 1, 2012, Plaintiff saw Dr. Marshall for a follow up appointment "after hitting the wall with his job." (Tr. at 310.) Plaintiff reported "looking into disability" and discussed this option with Dr. Marshall. He also reported "going to the gym daily." (Id.) On December 6, 2012, Dr. Marshall's treatment records again reflect that Plaintiff was "working on getting disability[,] which [Dr. Marshall] fully support[ed] due to [Plaintiff's] 'double depression.'" (Tr. at 309.) Dr. Marshall further noted that Plaintiff was not caring for himself and was experiencing poor sleep and concentration. Nevertheless, no medication changes were made, and Plaintiff was instructed to return for follow-up in 1-3 months. (Id.)

Notably, the records from Plaintiff's next three appointments, in March, June, and September of 2013, specifically reflect "[s]table affect and mood with good focus and conversational flow [and n]o evidence of mania, depression, or psychosis." (Tr. at 389, 390, 403.) These records also indicate that Plaintiff continued to take Ambien, despite Dr.

12

Marshall's earlier concerns about its effect on Plaintiff's memory. (Id.) However, on December 5, 2013, Plaintiff reported "acting out in sleep induced by [A]mbien," and Dr. Marshall discontinued the medication "due to sleep walking and memory issues." (Tr. at 405.) Although Dr. Marshall also noted that Plaintiff's dysphoric mood had returned at that time (id.), by Plaintiff's next appointment on April 3, 2014, he was again noted to have "[s]table affect and mood with good focus and conversational flow [and n]o evidence of mania, depression, or psychosis." (Tr. at 434.)

As noted by the ALJ, the above objective findings are clearly inconsistent with Dr. Marshall's assessment of "extreme" concentration difficulties due to depression during the same time period and his opinion that Plaintiff remained "completely unable to maintain focus needed to work even on a part-time basis" from October 2012 forward. (Tr. at 365.) Moreover, the record contains no evidence that Plaintiff's experienced any episodes of decompensation prior to Dr. Marshall's assessments, in direct contrast to that physician's assertion that Plaintiff experienced four or more such episodes, each lasting for at least two weeks. Further, Dr. Marshall opined in December 2012 that Plaintiff had a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement," (Tr. at 343), which is patently inconsistent with the treatment records indicating that Plaintiff lived alone and had no history of psychiatric interventions (Tr. at 315) and Plaintiff's reported activities of daily living. In light of these inconsistencies and lack of support in the medical record, substantial evidence supports the ALJ's assignment of little weight to Dr. Marshall's opinions.

13

B. Listing 12.04

Plaintiff next argues that substantial evidence fails to support the ALJ's adverse step three finding as to Listing 12.04. Listing 12.04 encompasses affective disorders, including depressive, manic, and bipolar syndromes, and may be met in one of two ways. Most commonly, a claimant first must manifest certain paragraph A criteria, i.e., specific symptoms set out in the listing itself. Pertaining to depression, a claimant must provide medical documentation of at least four of the following:

   a. Anhedonia or pervasive loss of interest in almost all activities; or
   b. Appetite disturbance with change in weight; or
   c. Sleep disturbance; or
   d. Psychomotor agitation or retardation; or
   e. Decreased energy; or
   f. Feelings of guilt or worthlessness; or
   g. Difficulty concentrating or thinking; or
   h. Thoughts of suicide; or
   i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04(A)(1). These criteria, in turn, must result in at least two of the following paragraph B criteria:

   1. Marked restriction of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04(B). In other words, a claimant must meet both paragraphs A and B.[6]

---

[6] Alternatively, a claimant may meet the criteria of 12.04(C) alone. However, in the present case, Plaintiff does not explain how he meets these alternative criteria. Furthermore, the ALJ specifically considered whether Plaintiff met the paragraph C criteria of Listing 12.04 and concluded that he did not. (See Tr. at 17; Pl.'s Br. at 8-10.)

Here, the ALJ determined at step three that Plaintiff was only moderately limited in terms of activities of daily living, social functioning, and concentration, persistence, or pace, and had experienced no episodes of decompensation. (Tr. at 16-17.) She therefore concluded that Plaintiff did not meet the paragraph B criteria of Listing 12.04. (Id.)

In challenging the ALJ's step three finding, Plaintiff relies entirely on (1) his own testimony as to the severity of his symptoms and (2) the opinion evidence offered by Dr. Marshall. (Pl.'s Br. at 9-10.) However, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms less than credible (Tr. at 20), and Plaintiff does not challenge that credibility finding. Moreover, as set out above, substantial evidence supports the ALJ's decision to assign little weight to the extreme, and largely unsupported, limitations opined by Dr. Marshall. As further explained above, the remainder of the record fails to demonstrate that Plaintiff suffered at least marked restrictions in two or more of the paragraph B criteria as required by Listing 12.04. Instead, the ALJ in the present case specifically analyzed Listing 12.04 at step three of the sequential analysis, but concluded that Plaintiff suffered no more than moderate limitations in any paragraph B criteria. (Tr. at 16-17.) Substantial evidence supports this determination.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #13] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #16] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 10th day of August, 2017.

/s/ Joi Elizabeth Peake
United States Magistrate Judge